UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

ROBERT E. HODGES, JR., )
)
    Plaintiff, )
)
vs. ) Case No. 2:09CV0001 AGF
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
    Defendant. )

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Robert E. Hodges, Jr., was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or Supplemental Security Income, under Title XVI of the Act, id. §§ 1381-1383f. For the reasons set forth below, the decision of the Commissioner shall be reversed and the case remanded for further proceedings.

Plaintiff, who was born on September 9, 1963, filed for disability benefits on February 3, 2006, at the age of 42½, alleging a disability onset date of February 6, 2004, due to coronary heart disease, cardiomyopathy, hypertension, hyperlipidemia, diabetes mellitus, and high blood pressure. (Tr. 118.) After Plaintiff's application was denied at the initial administrative level, he requested a hearing before an Administrative Law

---

[1] The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

Judge ("ALJ") and such a hearing was held on March 10, 2008. By decision dated July 24, 2008, the ALJ found that Plaintiff was disabled under the Act from February 6, 2004, through September 20, 2006, but that as of September 21, 2006, he experienced medical improvement and was not disabled from that date through the date of the decision. Plaintiff sought review by the Appeals Council of the Social Security Administration, submitting additional medical records along with his request for review. The request for review was denied on November 7, 2008. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ committed reversible error by not giving the opinions of Plaintiff's treating cardiologist (Greg Flaker, M.D.) substantial weight. Plaintiff requests that the ALJ's decision be reversed and remanded for an award of continuing benefits, or for further proceedings.

## BACKGROUND

**Work History**

The record indicates that Plaintiff worked as a factory line worker from 1992 to 1998, a night manager/cashier from 1999 to 2001, and a satellite installation and repair person (for his own business) from May 2001 to January 2005. (Tr. 132.)

**Medical Record**

The record indicates that on March 17, 2004, Plaintiff underwent a quadruple coronary artery bypass. (Tr. 314-16.) On June 2, 2004, it was noted that he had not started his cardiac rehabilitation due to cost. He reported that his Medicaid application

2

had just been approved the previous week and that he had lost his prescriptions. (Tr. 345.) On January 30, 2005, Plaintiff experienced another myocardial infarction. It was noted that he had not been compliant with medication due to cost. Two arterial stents were inserted and Plaintiff was released on February 1, 2005. (Tr. 341-44.) Clinic notes from March, April, and May 2005, assessed coronary artery disease, congestive heart failure, hyperlipidemia, and hypertension; Plaintiff's dosage of Coreg (a beta-blocker) was increased. (Tr. 331-39.) On January 12, 2006, Dr. Flaker stated that he would see Plaintiff in four to six months for consideration of an implantable cardioverter-defibrillator ("ICD"). (Tr. 328-29.)

On March 8, 2006, Plaintiff presented to the emergency room with shortness of breath and chest pain and was admitted to the hospital for 23-hour monitoring. (Tr. 259-70.) On March 13, 2006, Plaintiff underwent an exercise stress test, during which he achieved a "METs" of 10.[2] Plaintiff's functional aerobic impairment was noted to be +22 percent, which was considered normal. The echocardiography results showed that left ventricular function appeared to be at 35-40 percent, and diastolic dysfunction was suggested as well. (Tr. 241-44.)

---

[2] Exercise capacity frequently is reported in metabolic equivalents of task (METs). In patients with coronary artery disease, an exercise capacity of at least 10 METs signifies a good prognosis with medical therapy. An exercise capacity of 13 METs indicates a good prognosis even with an abnormal exercise ECG response. http://emedicine.medscape.com/article/811577-overview.

3

On May 3, 2006, Plaintiff underwent surgery to implant an ICD. It was noted that he had an ejection fraction of 30-35 percent,[3] and he was assessed as New York Heart Association ("NYHA") class II.[4] (Tr. 417-35.) On June 29, 2006, Dr. Flaker reported that Plaintiff had received a shock from the ICD within the last few days (indicating a rapid heart rate). (Tr. 414-16.) On September 21, 2006, Dr. Flaker noted that Plaintiff was having light-headed episodes daily. His ICD indicated many episodes of tachycardia, and Dr. Flaker concluded that Plaintiff's light-headedness might be due to sinus tachycardia. (Tr. 411-12.) On October 4, 2007, Dr. Flaker noted hundreds of episodes of sinus tachycardia. (Tr. 437-39.)

In a February 6, 2008 addendum to clinic notes, Dr. Flaker stated that Plaintiff was applying for disability. Dr. Flaker opined that in light of Plaintiff's shortness of breath, NYHA II ranking, fatigue (likely a manifestation of left ventricular dysfunction),

---

[3] The ejection fraction is a measurement of a heart's efficiency, and is used to estimate the function of the left ventricle, which pumps blood to the rest of the body. A normal ejection fraction is more than 55 percent. www.webmd.com/hw/health_guide_atoz/ug1391.asp.

When accompanied by other symptoms, an ejection fracture below 30 percent qualifies as a presumptive disability under the Commissioner's regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02B.

[4] The NYHA functional classification system assesses a patient's degree of heart failure. Class II is defined as "Slight limitation of physical activity. Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea." www.abouthf.org/questions_stages.htm.

numbness in extremities, and chest pain, Plaintiff's disability claim was "reasonable." (Tr. 445.)

**Evidentiary Hearing of March 10, 2008 (Tr. 28-44)**

Plaintiff testified that he finished 13 years of school, weighed 165 pounds, and was 5' 10". He reviewed his employment history and his history of heart attacks. He related that he went back to work installing satellites after the first heart attack, and had another heart attack on his first job back. Similarly, he had a third heart attack one month later when he went back to work after the second heart attack. Plaintiff testified that he lived with his wife (and two children ages 14 and 16) in a two-story house. Because going up the stairs was too tiring for him, they converted the first-floor coat closet into a closet for him and he slept on the first floor. He could only stand for a short time because his right leg "goes numb," and he got exhausted "extremely easily."

Plaintiff testified that Dr. Flaker told him that approximately 36 percent of his heart still worked and the rest was dead muscle. Dr. Flaker also believed that his ejection factor was under 30. He testified that the ICD went off a few months ago and saved his life. This happened when he was just lying around. During the day, when his wife was at work, he would do what he could around the house. He did the laundry, explaining that he would go down the stairs to the basement where the washing machine was and read a book while waiting for a load to be done before coming back upstairs. He took his children to school, and could help with cooking but not for too long due to the numbness in his right leg, which his doctors told him was the result of diminished circulation.

Plaintiff testified that he went to the grocery store with his wife, but would sit on the "old man bench" inside the store while she did the shopping. He stopped going on his family's vacations because he could not walk around and do things. He also needed to rest during the day. After taking the children to school, he would nap for about one half hour, and would nap again in the afternoon. He believed that he could lift things weighing 20 to 25 pounds, but he recently carried a load of laundry upstairs, and then "was done for a good half hour." Plaintiff drove, but would have someone with him for lengthy drives. On a trip of 30 to 40 miles he would have to pull over in the middle to rest.

Plaintiff testified that he was taking an unusually high dosage of Coreg, as prescribed, and that it made him dizzy. He pointed to a cane he had with him and explained that he did not have it for dizziness, but that it came in handy for that too. He missed doctors' appointments on occasion due to lack of money. Plaintiff always had a fresh bottle of nitroglycerin with him and used it approximately every two weeks. He also testified to problems with shortness of breath.

Plaintiff stated that he thought he would be able to handle a cashier's job with a sit/stand option, but that places he had worked were unwilling to hire him in that capacity because of his health condition. He then testified that he would need to rest during an eight-hour workday.

**ALJ's Decision of July 24, 2008 (Tr. at 14-21)**

The ALJ found that Plaintiff had the following severe impairments: coronary

artery disease and residuals from a quadruple bypass surgery and multiple stent procedures; and diabetes melitus type two.  The ALJ found that from February 6, 2004, through September 20, 2006, Plaintiff did not have the RFC to maintain stable employment and there were no jobs that he could perform.  The ALJ found that medical improvement occurred as of September 21, 2006, the day on which Dr. Flaker saw Plaintiff and reported no significant abnormality.

The ALJ found that as of September 21, 2006, Plaintiff had the RFC to perform the full range of sedentary work,[5] except that he was precluded from moderate exposure to temperature extremes.

In support of this finding, the ALJ found it significant that Plaintiff did not return to see Dr. Flaker six months after the September 21, 2006 visit as instructed, and did not see Dr. Flaker again until October 4, 2007, at which time Dr. Flaker detected normal leg circulation.  The ALJ stated that there was no evidence that Plaintiff complied with

---

[5] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally.

20 C.F.R. § 404.1567(a).

> "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday.  Sitting would generally total about six hours of an eight-hour workday.

Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

instructions to return four months later, "[d]espite a notation entry on February 6, 2008." The ALJ stated that he gave "strong weight" to the report and evaluations of Dr. Flaker. Two sentences later, the ALJ stated that he gave "little weight" to Dr. Flaker's opinion that Plaintiff's disability claim was reasonable, as that was a matter reserved for determination by the ALJ. The ALJ pointed to Dr. Flaker's consistent classification of Plaintiff as an NYHA Class II, which the ALJ stated supports a finding that Plaintiff could perform sedentary work.

The ALJ stated that Plaintiff's "lack of sustained or even regular treatment and frequent visits to emergency rooms after he had not been taking medication is consistent with a significant medical improvement after implantation of the pacemaker and difibrillator." The ALJ stated that the most important factor relied upon in finding medical improvement was the result of Plaintiff's March 13, 2006 stress test. The ALJ stated that the pictoral diagram of the test results showed non-functional areas of Plaintiff's heart, but not 66 percent as Plaintiff had testified his doctors told him, or even 50 percent. The ALJ also pointed to the comment that Plaintiff achieved 10 METS and the statement that Plaintiff's functional aerobic impairment was only 22 percent.

The ALJ found that Plaintiff's medical improvement was related to the ability to perform work-related activities. In sum, the ALJ concluded that beginning on September 21, 2006, Plaintiff could not perform his past work, but had the RFC to perform substantially all the requirements of sedentary work, as his only limitation was the need to avoid extremes of heat and cold. Applying Plaintiff's vocational factors to the

Guidelines for sedentary work resulted in a finding that Plaintiff was not disabled as of September 21, 2006.

**New Evidence Submitted to Appeals Council**

In conjunction with his request for review of the ALJ's decision, Plaintiff submitted to the Appeals Council Dr. Flaker's clinic notes from July and August 2008. On July 11, 2008, Dr. Flaker reported a left ventricular ejection fraction of 30 percent, indicating severe dysfunction. (Tr. 448-49.) On July 30, 2008, Dr. Flaker reported a left ventricular ejection fraction of 34 percent. On August 11, 2008, Dr. Flaker wrote that he "favor[ed] disability, due to Plaintiff's cardiac dysfunction, ongoing chest pain, and the shock from the defibrillator." (Tr. 450.)

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)).

9

"Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The "medical improvement" standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits. Delph v. Astrue, 538 F.3d 940, 945-46 (8th Cir. 2008), cert. denied, 129 S. Ct. 1999 (2009)). The process involves a sequential analysis prescribed in 20 C.F.R. § 404.1594(f), pursuant to which the Commissioner must determine the following:

> (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant

10

has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

Id.

The regulations define medical improvement as:

[A]ny decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

20 C.F.R. § 416.994(b)(1)(i). Medical improvement can be found in cases involving the improvement of a single impairment if that improvement increases the claimant's overall ability to perform work related functions. Id. § 416.994(c).

In addition, where, as here, the Appeals Council has considered new and material evidence and declined review, the reviewing court must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000) (quoting Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000)).

**Weight Accorded the Opinion of Plaintiff's Treating Cardiologist**

Plaintiff argues that the ALJ erred in not according Dr. Flaker's opinions substantial weight. The Court agrees. The weight to be given a medical opinion is governed by a number of factors, including the examining or treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the

source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2). However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (citations omitted); see also Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).

Here, the ALJ found that Plaintiff was not disabled as of September 21, 2006, the same day that Dr. Flaker noted that Plaintiff was having light-headed episodes daily. As noted above, the ALJ found the results of the March 13, 2006 stress test to be the most important piece of medical evidence supporting the conclusion of medical improvement. But less than two months after this test, it was determined that Plaintiff needed an ICD. In addition, it appears to the Court that in interpreting the pictoral section of the test results, the ALJ drew upon his own inferences, something an ALJ is not permitted to do. See Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000); Landess v. Weinberger, 490 F.2d 1187, 1189 (8th Cir. 1974).

There is no medical opinion supporting the ALJ's determination that Plaintiff

12

could work at a sedentary job full-time as of September 21, 2006.  It is true that even a treating physician's opinion "that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."  House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).  But here, there is nothing in the record to contradict Dr. Flaker's opinions expressed on February 6, 2008, and August 11, 2009, suggesting that Plaintiff could not maintain full-time work.

Ordinarily, when a reviewing court concludes that a denial of disability benefits was improper, the court, out of "abundant deference to the ALJ," should remand the case for further administrative proceedings; remand with instruction to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000) (citations omitted).  Here, the Court does not believe that there is overwhelming evidence that would warrant an order to continue benefits beyond September 26, 2006.   Rather the Court believes the ALJ should be allowed to more fully consider Plaintiff's RFC, and possibly further develop the record by re-contacting Dr. Flaker and/or obtaining the opinion of a medical expert and/or of a vocational expert.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of March, 2010.